F I L E D
United States Court of Appeals
Tenth Circuit

AUG 4 1997

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

AUGUSTINE DANIEL ROYBAL,

Petitioner-Appellant,

v.

JOHN SHANKS, Warden,
ATTORNEY GENERAL OF THE
STATE OF NEW MEXICO,

Respondents-Appellees.

No. 96-2096
(D.C. No. CIV-92-1249-BB)
(D. N.M.)

---

ORDER AND JUDGMENT[*]

---

Before BRORBY, BARRETT, and MURPHY, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Petitioner Augustine Daniel "Goro" Roybal filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 arguing that his conviction for aggravated burglary was unconstitutional because there was insufficient evidence to convict and, further, that the trial court erred in refusing to give particular jury instructions. The district court denied the petition. We grant petitioner's motion for a certificate of probable cause,[1] and we affirm.

Testimony at trial revealed that petitioner and his brother and co-defendant, Juan Roybal, gained access to the apartment of Darlene Rodriguez early in the morning of February 3, 1989. Juan Roybal was armed and demanded to see Darlene's friend, Guillermo "Mimo" Quintero, who was asleep in a back bedroom. As Juan walked to the bedroom, petitioner took Darlene and walked her to the kitchen. He would not allow her to leave the kitchen and told her that, if

---

[1]     The Supreme Court recently held that the new provisions of Chapter 153 of Title 28 of the United States Code, which includes § 2253(c) requiring certificates of appealability, added by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), are generally not applicable to cases filed before AEDPA's effective date, April 24, 1996. See Lindh v. Murphy, No. 96-6298, 1997 WL 338568, at *8 (U.S. June 23, 1997). Lindh effectively overrules Lennox v. Evans, 87 F.3d 431 (10th Cir. 1996), cert. denied, 117 S. Ct. 746 (1997), to the extent that Lennox held that § 2253(c) applied to habeas petitions filed prior to AEDPA's effective date. Because the habeas petition in this case was filed prior to that date, petitioner is not subject to AEDPA, but he is subject to § 2253's previous requirement that he obtain a certificate of probable cause to appeal. Regardless of which label applies, petitioner's substantive burden is the same. As we held in Lennox, both certificates of probable cause and of appealability require that a petitioner "make a substantial showing of the denial of a federal constitutional right." 87 F.3d at 434.

she attempted to leave the building, she would be shot. While in the kitchen, Darlene heard Juan and Mimo arguing about money and then heard a gunshot.

After the first shot, Darlene and petitioner ran to the bedroom where they witnessed Juan fire a second shot, this one hitting Mimo in the neck. During the interim between the two shots, petitioner urged his brother to stop the shooting and indicated that the pair had not contemplated gunplay. He did not, however, attempt to interfere physically with his brother's actions. In the course of the episode, petitioner took a pair of Mimo's pants, apparently believing that keys to a car would be in the pants.[2]

We conduct a de novo review of the legal basis for the district court's dismissal of the petition. See Sena v. New Mexico State Prison, 109 F.3d 652, 653 (10th Cir. 1997). The power of the federal courts in habeas proceedings is limited. See Barefoot v. Estelle, 463 U.S. 880, 887 (1983). A state prisoner is eligible for habeas relief only if he can demonstrate "state court errors which deprived him of fundamental rights guaranteed by the Constitution of the United States." Brinlee v. Crisp, 608 F.2d 839, 843 (10th Cir. 1979). In making the determination of constitutionality, we are bound by the state court's interpretation of state law, see Mullaney v. Wilbur, 421 U.S. 684, 691 (1975), and, unless they are not fairly supported by the record, we accord a presumption of correctness to

---

[2] The keys were later found in the apartment; the car was not taken.

a state court's factual findings, see Lujan v. Tansy, 2 F.3d 1031, 1035 (10th Cir. 1993) ("Explicit and implicit findings by state trial and appellate courts shall be presumed to be correct unless one of seven factors listed in section 2254(d) are present or the federal court concludes that the state court findings are not fairly supported by the record.") (quotation omitted).

INSUFFICIENT EVIDENCE

We turn first to petitioner's contention that he was denied his rights under the Fourteenth Amendment because he was convicted on insufficient evidence. When a state prisoner brings a habeas petition challenging the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979).

In New Mexico, the pertinent elements of aggravated burglary are:

the unauthorized entry of any . . . dwelling . . . with intent to commit any felony or theft therein and the person either:

A.    is armed with a deadly weapon;
B.    after entering, arms himself with a deadly weapon;
C.    commits a battery upon any person while in such place, or in entering or leaving such place.

N.M. Stat. Ann. § 30-16-4. Petitioner argues that the evidence presented at his trial was deficient in two respects in relation to this statute: it did not establish unauthorized entry, and it did not establish his intent to commit a felony or theft at the time of entry.

*Authorization to Enter*

Petitioner bases much of his argument regarding the nature of his entry on Officer Schultz's recap of the statement given to him by Darlene Rodriguez shortly after the crime. Officer Schultz testified that Darlene told him she recognized petitioner as an acquaintance or associate of her boyfriend, Mimo, and that she "closed the door, unlatched it, opened the door and let them in." R. Tr. 11/1/89 at 62. Officer Schultz further testified he had not noticed any damage to the door or the chain lock and that no such damage had been reported to him by the other investigators. Id. at 86.

However, when Officer Schultz was asked to read from Darlene's actual statement, he read the following: "I heard a knock at the door and asked who was it. He said it was Johnny, open the door. I had a chain lock on the door and John pushed his way in." Id. at 115. In response to the question of whether he could identify any place in the statement where Darlene indicated she opened the door to Daniel Roybal, Officer Schultz confusingly stated, "I don't know that she specifically -- she opened because she recognized him, yes." Id. at 116.

-5-

The colloquy between the prosecutor and Darlene Rodriguez regarding the entry issue was as follows:

> Q.    When Juan [Darlene's infant son] awakened you, what did you do?
>
> A.    I got up to make him a bottle. I was in the kitchen making the bottle. About 2:00, I heard a knock on the door.
>
> . . . .
>
> Q.    When you heard the knock, what did you do?
>
> A.    I asked who it was, he said it was John [Juan].
>
> Q.    And after you heard that, what happened?
>
> A.    I was going to open the door, he just pushed his way in.
>
> Q.    And was the door locked with a chain?
>
> A.    If I can remember right, yeah, it was, yes.
>
> Q.    You say he pushed his way in, what do you mean by that?
>
> A.    He pushed his way in. I opened the door, I didn't have it all the way open and he pushed his way in.

R. Tr. 10/31/89 p.m. at 3-4.

After describing Juan's entry and the way he brandished a gun in her face, Darlene was asked,

> Q.    Okay. Did anyone else come in through the front door besides the individual with the gun?
>
> A.    Yeah, he pushed the door back and I was standing half behind the door, half my body behind the door, holding it and then Augustine Daniel Roybal came in.

-6-

Q.  And how did he tell -- do you remember the exact words?

A.  He came in.  I just said, "Come in."

Q.  Did you call him by name, or --

A.  Just told him to come in.

Id. at 4-5.

Upon cross examination by Juan's attorney, the following testimony was elicited from Darlene:

Q.  Now when the people entered your apartment on February 3d at 2:00 in the morning, you testified on direct that they pushed the door open?

A.  Yes.

Q.  Could you see Goro -- Daniel at that time?

A.  No, he was behind the wall.

Q.  And they pushed the door open even though you had a chain lock on; isn't that right?

A.  Yes.

Q.  But on September 12th, you talked about how the door frame had been broken; isn't that right?

A.  Yes.

Q.  So, the chain lock was broken at that time?

A.  It wasn't broken in, just the frame of the door.

Q.  So there was a lock attached to the chain lock too, at that point?

A. Yeah, it was attached to the wall, but it wasn't tight enough.

Q. You told Chris Schultz on February 3d that you let them in?

A. I can't remember exactly everything that's happened.

Id. at 37.

The New Mexico Court of Appeals, in the calendar notice proposing summary affirmance of petitioner's conviction for aggravated burglary, relied on a representation in the docketing statement recounting testimony by Darlene Rodriguez that "the men forced their way in." See R. Vol. I, tab 6, Exh. C at 2. The calendar notice concluded that, "the jury was entitled to believe this trial testimony and disbelieve the statement to Schultz, thereby providing substantial evidence of the element of unauthorized entry." Id. The Court of Appeals adopted this reasoning in its memorandum opinion. See id., Exh. E at 1.

Despite the occasionally confused quality of the testimony regarding the circumstances of petitioner's entry into the apartment, we find that the record fairly supports the jury's finding that petitioner made an unauthorized entry into the dwelling. When viewed in a light most favorable to the state, a rational trier of fact could have found the element of unauthorized entry beyond a reasonable doubt. See Jackson, 443 U.S. at 318.

*Intent to Commit Any Felony or Theft*

-8-

Turning to the intent issue, petitioner argues that there was no evidence to establish that, at the time of entry, he shared his brother's criminal intent and that he did not help, encourage or cause the crime committed by his brother. He maintains he was "merely present" at the scene. We disagree. Despite evidence in the record tending to show that petitioner did not condone the shooting, there is also evidence that his participation was instrumental in facilitating the crime and that he intended to commit theft, aggravated assault, or some other felony at the time of entry into the apartment with his brother.

Immediately after petitioner's brother left the hallway to confront Mimo in the bedroom, petitioner took Darlene to the kitchen and told her that if she left the apartment she would be shot by persons waiting outside. R. Tr. 10/31/89 p.m. at 5-6. Petitioner refused to allow Darlene to leave the kitchen, even to be with her children in the bedroom. Id. at 23. Darlene told Officer Schultz that, after the first shot was fired, she tried to get out of the kitchen but was prevented from doing so by petitioner. Id. at 39. She had wanted to call the police but could not because she was being held by petitioner. R. Tr. 11/1/89 at 35.

In addition to keeping Darlene from interfering with the assault, there is also evidence that petitioner did nothing physically in order to interrupt the assault. After the first shot was fired, petitioner ran back to the bedroom and stood an arm's length from his brother but did nothing other than question his

-9-

brother about the shooting.  R. Tr. 10/31/89 p.m. at 24.  Further, while his brother held a gun to Mimo's head, petitioner took Mimo's pants which supposedly held keys to a car.  R. Tr. 11/1/89 at 37.  Darlene testified that the men had said, in her presence, that they wanted the keys to the car.  Id.

Finally, Darlene's sister, Dana, testified that she was familiar with petitioner's voice and that she heard him say, "Give it to him or he'll shoot," as petitioner's brother and Mimo were arguing.  Id. at 43.

In its calendar notice, the New Mexico Court of Appeals, citing New Mexico law, noted that "the fact that a theft was committed allows the jury to infer the requisite intent."  R. Vol. I, tab 6, Exh. C at 2.  We are bound by this interpretation of state law.  See Mullaney, 421 U.S. at 691.  Further, the court concluded that "from the evidence of what his brother did to the victim the jury could infer defendant's shared intent to commit aggravated assault."  Id.  The Court of Appeals relied on this analysis to conclude that "defendant and his co-defendant forced their way into the house under circumstances indicating they shared an intent to commit crimes inside."  Id., Exh. E at 2.  This finding of fact is presumptively correct because it is fairly supported by the record, see Lujan, 2 F.3d at 1035.  In addition, our review of the record reveals evidence sufficient for a rational trier of fact to find beyond a reasonable doubt that petitioner

-10-

intended to commit a felony upon entering the apartment.  See Jackson, 443 U.S. at 318.

## JURY INSTRUCTIONS

A § 2254 petitioner has a heavy burden in attempting to set aside a state conviction based on an erroneous jury instruction.  Maes v. Thomas, 46 F.3d 979, 984 (10th Cir. 1995).

> A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.  The question in this proceeding is not whether the instruction is undesirable, erroneous, or even universally condemned, but whether the instruction so infected the trial that the resulting conviction violates due process.  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.  The degree of prejudice from the instruction error must be evaluated in the context of the events at the trial.

Id. (quotations and citations omitted).

Petitioner does not argue that any of the instructions given to the jury were erroneous.  He contends, instead, that two of his proposed instructions should have been given and that their omission denied him a fair trial.  As noted above, even the heavy burden faced by a habeas petitioner who complains about an

-11-

alleged erroneous instruction becomes heavier when the error alleged is the omission of a proffered instruction.

The first instruction petitioner contends should have been read to the jury can be summarized as telling the jury that petitioner's mere presence at the crime scene and knowledge that a crime was being committed was not enough to convict him as an aider and abetter.[3]  The New Mexico Court of Appeals concluded that, because the instruction on accomplice liability told the jury they would have to find that the defendant intended that the crime be committed and had to have helped or encouraged it, petitioner's "mere presence" point was made, albeit in the positive.  The court stated, "[i]t was, therefore, unnecessary to tell the jury that, if defendant was merely present and did not share the intent of the principal and did not help the principal, the jury should find him not guilty."  R. Vol. I, tab 6, Exh. E at 2.  We agree and find no constitutional infirmity in the trial court's refusal to give petitioner's "mere presence" instruction.

Similarly, there was no violation of constitutional magnitude in the trial court's refusal to give petitioner's tendered specific intent instruction which stated, *inter alia*, that "the government [sic] must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the

---

[3]  The proposed "mere presence" instruction and the instructions actually given are set out in petitioner's brief in chief at page 12, notes 3 and 4.  We will not repeat them here.

-12-

law." Appellant's Brief in Chief at 15 n.6. The intent instruction was not a uniform instruction and, according to the New Mexico Court of Appeals, did not accurately state New Mexico law, where "specific intent is not a specific purpose to violate the law but simply an intent to achieve a further consequence." R. Vol. I, tab 6, Exh. C at 3. We are bound by this state court construction of state law. See Mullaney, 421 U.S. at 691. Additionally, each substantive crime instruction given included the idea that the intent to achieve further consequences must be proven. See, e.g., Record Proper, Vol. I at 85 (aggravated burglary instruction).

The judgment of the United States District Court for the District of New Mexico is AFFIRMED.

Entered for the Court

Wade Brorby
Circuit Judge